**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION**

CARD ISLE CORPORATION,

               Plaintiff,

    v.

TARIQ FARID; EDIBLE ARRANGEMENTS,
LLC; and NETSOLACE, INC.,

               Defendants.

Civil Action No. _7:20CV708_

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiff Card Isle Corporation ("Plaintiff" or "Card Isle"), by counsel, alleges and complains of Defendants Tariq Farid, Edible Arrangements, LLC ("Edible," "Edible Arrangements," or "EA"), and Netsolace, Inc. ("Netsolace" or "NI"), (together, "Defendants") as follows:

## SUMMARY OF ACTION

1.      Card Isle, a small Blacksburg, Virginia-based technology startup formed by three Virginia Tech graduates, brings this action to stop the theft of its intellectual property by a former client. Card Isle offers online retailers a turnkey solution to sell personalized greeting cards through their website. As its business grew, Card Isle was approached to provide its product to certain franchisees of Edible Arrangements, a company that specializes in online fresh-fruit gift arrangements. To expand its business to the Edible franchisees, however, Card

Isle was required to provide highly confidential information about its product and technology to the corporate franchisor for review and approval.

2. Card Isle executed  a binding Non-Disclosure Agreement and a binding Services Agreement with Defendants Tariq Farid, Edible, and Netsolace, under which Card Isle would provide Defendants access to the intellectual property owned by Card Isle and developed after years of research and substantial investment.  This valuable intellectual property would include copyrighted computer source code, trade secret information, and technical know-how.  Both Agreements expressly provide that Card Isle's intellectual property is confidential, owned exclusively by Card Isle, and cannot be reverse engineered, decompiled, or disassembled by Defendants.

3. After Card Isle executed these agreements, the three founders were invited to a meeting with Tariq Farid, founder of Edible and President and Director of Netsolace.  Card Isle expected that the meeting would focus on its growing partnership with Edible to provide greeting card technologies to the Edible franchises.  Instead, Mr. Farid fixated on whether Card Isle would sell its business to Edible.  Card Isle dismissed the idea of selling its business, especially for Mr. Farid's low-ball offer, which he justified by stating he could build Card Isle's product himself.  After Card Isle's refusal to discuss a corporate acquisition, Mr. Farid cut the meeting short.

4. Card Isle did not believe Mr. Farid actually would attempt to replicate its product, especially given the multiple confidentiality agreements prohibiting Edible and Netsolace from using Card Isle's intellectual property and trade secret information to reverse engineer, decompile, or disassemble Card Isle's product.  But that is exactly what Mr. Farid and his companies did.

5.      After the meeting with Mr. Farid, per Defendants' request, ostensibly to facilitate expanding Card Isle's business with the Edible franchisees, Card Isle provided Edible and Netsolace with copyrighted computer source code, trade-secret information, and technical know-how, all subject to the protections and confidentiality provisions of the non-disclosure agreements and services agreement.

6.      Shortly thereafter, Defendants then misappropriated this intellectual property, launched their own greeting card product (a complete replica of the Card Isle product), and replaced all Card Isle technology among Edible franchisees with this new, copied product.

7.      Defendants have wrongfully taken Card Isle intellectual property and commercially exploited it for their own gain, and now stand to realize millions of dollars in value from Card Isle's intellectual property.

8.      By this action, Card Isle seeks damages that will fairly and fully compensate it for Defendants' copyright infringement, misappropriation of trade secrets, and breach of contract. Without this relief, Defendants will continue to profit unjustly and Card Isle will continue to lose revenue.

## THE PARTIES

9.      Card Isle is a Virginia corporation with its principal place of business in Blacksburg, Virginia.  Card Isle offers online retailers a turnkey solution to sell personalized greeting cards through their website.  This technology startup was founded in 2013 by three Virginia Tech engineering students with the goal to use their technology expertise to develop a product to make  greeting cards more personal, accessible, and fun.  Card Isle's proprietary technology allows greeting cards to be designed and personalized on a business' website and then printed on-demand at their stores.  Card Isle offers over 15,000 designs created by local and

independent artists for businesses and users to choose from to create meaningful greeting cards. Card Isle also offers an eCommerce solution that allows retailers to cross-sell personalized greeting cards with any product ordered online. To accomplish this, Card Isle creates a fully customizable Application Programming Interface ("API") that is seamlessly integrated into existing websites. Card Isle has built and maintained integrations with major eCommerce platforms in the floral, gift basket, and food delivery markets.

10.     Tariq Farid is an individual who is a citizen of Georgia. Mr. Farid is the founder of Edible Arrangements, LLC and the Chief Executive Officer of Edible Brands, LLC, the parent company that includes a number of businesses including Edible Arrangements, LLC. Mr. Farid is also President and Director of Netsolace, Inc. Upon information and belief, Edible Arrangements and Netsolace were acting at the direction of Mr. Farid with respect to the misappropriation and use of Card Isle's intellectual property and copyrighted material.

11.     Edible Arrangements, LLC is a single-member limited liability company. Its sole member is Edible Brands, LLC, a single-member limited liability company. Edible Brands, LLC's sole member is TKF Holdings, Inc., a corporation incorporated in Connecticut with its principal place of business in Georgia. Edible Arrangements is a franchising business that specializes in fresh fruit arrangements and other specialty fruit gift items. The company was founded in 1999 by Tariq Farid, who now serves as Chief Executive Officer of Edible Brands, LLC. Today, over 1,200 Edible Arrangements franchises exist worldwide.

12.     Netsolace, Inc. is a corporation incorporated in Delaware with its principal place of business in Georgia. Netsolace provides technology solutions for the franchise industry, including for Edible Arrangements, LLC and Edible Brands, LLC. Tariq Farid is also President and Director of Netsolace, Inc. Upon information and belief, Netsolace was acting as an agent

for and/or jointly or in concert with Edible Arrangements with respect to the misappropriation and use of Card Isle's intellectual property and copyrighted material.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1338(a) because this action arises under the copyright laws of the United States, Title XVII of the United States Code, and pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000.

14.     This Court has personal jurisdiction over Defendants because they transact business in the Commonwealth of Virginia, contract to supply services or things in the Commonwealth of Virginia, caused tortious injury by an act or omission in the Commonwealth of Virginia, and pursuant to Va. Code § 8.01-328.1, the exercise of personal jurisdiction over Defendants is consistent with due process.

15.     Venue is proper in this District and Division pursuant to 28 U.S.C. § 1391 and Local Rule 2(b) because Defendants are subject to personal jurisdiction in this District and Division and a substantial part of the events or omissions giving rise to the claims occurred in this District and Division.

## FACTS

**I.      Card Isle's Product and Its Proprietary and Confidential Information**

16.     Card Isle offers online retailers the coding systems, infrastructure and support to allow shoppers to easily design, order, and print personalized greeting cards through the retailer's website.  At a high level, Card Isle creates a customized block of source code that an eCommerce retailer plugs into its eCommerce platforms.  This allows shoppers to seamlessly access the Card Isle functionality without leaving the retailer's website through the use of an

iframe, a tool used to embed content from one website into another website. When creating a software solution for any customer, Card Isle builds a unique User Experience (UX) to match the look and feel of the customer's website.

17.     One of the key aspects of Card Isle's proprietary technology is that it can be easily integrated into any existing website using a unique, non-obvious, and confidential process—the Card Isle eCommerce integration.  Card Isle creates a confidential customer-specific blueprint and block of code, (together, the "Card Isle eCommerce Integration Blueprint,") to guide customers seamlessly through the Card Isle eCommerce integration.  The Card Isle eCommerce Integration Blueprint explains how various components of the Card Isle technology platform interact, a process that is confidential and unique to Card Isle.  Without the Card Isle eCommerce Integration Blueprint, it would be very difficult, time consuming, and costly for a retailer to integrate the Card Isle functionality into an existing website.

18.     The retailer-specific block of code is used to enable shoppers on a retailer's website to seamlessly access Card Isle functionality.  This retailer-specific block of code is the only change made to the retailer's code base and serves to load two proprietary libraries onto the retailer's website.  These two proprietary libraries consist of three files and reside on Card Isle's servers.  The first of these, the "Card Isle Embed Library," is used by all retail customers and consists of two computer programming languages, JavaScript and CSS.  The second, the "Retailer-specific library," is a JavaScript library that Card Isle customizes for each retailer, such as Defendants. Together, these two libraries enable the Card Isle iframe to interact with the retailer's website.

19.     The Retailer-specific library handles all UX modifications and functionality associated with the greeting cards.  This technology is unique because it allows retailers to make

significant changes to their websites with minimal development effort. Although other companies use drop-in JavaScript (such as Facebook or Google trackers), Card Isle's Retailer-specific library offers UX changes that have a measurable impact on a retailer's customers.

20.     One advantage of Card Isle's eCommerce integration is that shoppers can easily and seamlessly design a greeting card without leaving the retailer's website. The Card Isle greeting card design experience takes place on Card Isle's website through the use of the Card Isle iframe. Instead of requiring a user to open a new browser tab, Card Isle uses an iframe to open Card Isle's website from within the same tab as the retailer's website. The iframe is styled as a pop-up inside the retailer's website to ensure that the Card Isle design interface is sandboxed from the retailer's site. Thus, a customer never has to leave the retailer's site to design and purchase customized greeting cards.

21.     Another benefit of Card Isle's eCommerce integration is that it requires a retailer to make very few changes to its existing website. One of the ways that Card Isle is able to accomplish this feat is to integrate with a retailer's existing infrastructure used to add upsells and cross-sells (e.g., balloons, chocolates, etc.) to a given order. In order to use existing infrastructure, Card Isle relies on embedded code that the retailer's customer never sees.

22.     Finally, once the design experience is complete, Card Isle's proprietary Printing Service handles remote printing and monitors all connected printers. The Printing Service converts information from the iframe into a PDF and connects to the printers via the cloud.

**II.    Defendants' Access to Card Isle's Proprietary and Confidential Information**

23.     In late 2018, Card Isle was approached by an Edible Arrangements franchisee interested in offering Card Isle products at his franchise locations in Houston. Card Isle learned

that cooperation from Edible Arrangements LLC was necessary to proceed and to allow Card

Isle to provide Edible shoppers with access to the Card Isle functionality and service.

24.     On May 16, 2019, Card Isle presented a sales pitch over video chat to Somia

Farid, Vice President and General Manager of Netsolace and Vice President of eCommerce for

Edible Brands.  Following this successful pitch, Card Isle was invited to Defendants'

headquarters in Atlanta, Georgia to conduct an in-person product demonstration.

25.     On May 20, 2019, in advance of the product demonstration at Defendants' Atlanta

headquarters, Card Isle entered into two mutual non-disclosure agreements ("NDAs"), one with

Edible Arrangements, LLC and one with Netsolace, Inc. (attached as Exs. A and B).  Pursuant to

the NDAs, Netsolace and EA "agree[] to use Confidential Information for the sole purpose of

evaluating certain products and/or services solely in connection with [EA and] NI's and [Card

Isle's] potential business relationship.  Confidential Information may not be otherwise used,

disclosed, reproduced, summarized or distributed."  Exs. A and B § 2.c.

26.     "Confidential Information" was defined broadly to include, "any and all

information in tangible and intangible form relating to and/or including Disclosing Party's

released or unreleased software, know-how, inventions, techniques, processes, algorithms,

software programs, schematics, designs, product plans, contracts, customer lists, financial

information, financial statements, business policies or practices, pricing information, the terms

and conditions of any proposed (or actual) license agreement or other agreement concerning

Disclosing Party products or services, negotiations, the marketing or promotion of any

Disclosing Party products or services, and information received from others that Disclosing Party

is obligated to treat as confidential."  Exs. A and B § 1.a.

27.     The NDAs also prohibited EA and NI from "reverse engineer[ing],
decompile[ing] or disassembl[ing] any software disclosed" to EA and NI.  Exs. A and B § 2.d.

28.     On May 21, 2019, Card Isle conducted an in-person product demonstration for
Defendants at their headquarters.  Following this productive meeting, Edible Arrangements
opted to deploy an active trial of the Card Isle product integration at certain Edible Arrangement
franchises.

29.     Card Isle subsequently created a retailer-specific JavaScript library for Edible in
advance of the trial integration (the "Edible Arrangements-specific JavaScript Library").

30.     On May 30, 2019, Card Isle co-founders met Edible Arrangements founder and
CEO Tariq Farid for a breakfast meeting in Charlotte, North Carolina.  While the Card Isle team
expected to discuss the trial Card Isle eCommerce integration and further partnership
opportunities, Mr. Farid steered the conversation in an opposite direction and fixated on
discussing Card Isle's potential purchase price.   Card Isle indicated they were not interested in
selling their business for the low-ball amount Mr. Farid offered, but would like to continue their
integration partnership.  During this meeting Mr. Farid made statements about his ability to build
Card Isle's product himself as justification for his low-ball offer.  After Card Isle's refusal to
discuss a corporate acquisition, Mr. Farid cut the meeting short.

31.     On June 3, 2019, the confidential and proprietary Card Isle eCommerce
Integration Blueprint and access to Card Isle's Proprietary Libraries were shared with Muddassir
Yaqub, Director of Web Development at Edible Arrangements, and Emily Moth, Director of
Products at Netsolace.  This Blueprint included a block of source code that Card Isle built
specially for Edible Arrangement's eCommerce platform and confidential links to the Card Isle
Embed Library, the Edible Arrangements-specific JavaScript Library, and the Card Isle iframe.

32.     The source code comprising the Card Isle Embed Library, the Edible
Arrangements-specific library, and the Card Isle iframe is encompassed in Card Isle Code Base
Version 3, an original work of authorship that is subject to protection under United States
copyright laws.  Card Isle registered its copyright in the Card Isle Code Base Versions 1 and 3 on
October 14, 2020 with the United States Copyright Office (Registration No. TXu002222301).  A
copy of the Certificate of Registration is attached as Exhibit C.

33.     The source code contained within Card Isle's eCommerce integration for Edible
Arrangements (including the Card Isle Embed Library, the Edible Arrangements-specific library,
and the Card Isle iframe) and the Card Isle eCommerce Integration Blueprint shared with Edible
pursuant to a confidentiality agreement are not known or readily ascertainable by proper means.
In addition, Card Isle has implemented a number of security measures to protect its intellectual
property.  For instance, access to Card Isle functionality is only available to Card Isle employees
who have signed a confidentiality agreement.  Card Isle also restricts access to sensitive
information by sanitizing incoming data, throttling access to its API, obfuscating its source code,
IP whitelisting, and implementing industry-standard authentication processes.

34.     The file name for Card Isle's Edible Arrangements-specific JavaScript library,
https://s3.amazonaws.com/**cardisle.web**/static/ecommerce/edible/**edible_v1.js**, clearly indicates
that the source code originated from Card Isle.  Further, the first two lines of the code clearly
indicate Card Isle's ownership and copyright in the code:

```
Copyright Card Isle Corporation 2019-2020
For questions, please contact info@cardisle.com
```

### III.   The Services Agreement

35.     On October 10, 2019, Card Isle and Edible Arrangements executed the Services
Agreement (attached as Exhibit D), a legally binding one-year contract pursuant to which Card

Isle agreed to provide the infrastructure and support to franchisees of Edible Arrangements to allow the franchisees to sell Card Isle products at their individual franchises.

36.     Section 1.a of the Services Agreement prohibited Edible Arrangements from directly or indirectly reverse engineering, decompiling, disassembling, or otherwise attempting to discover the source code, object code or underlying structure, ideas, know-how or algorithms relevant to the Services or the Software (as defined in the Services Agreement).  Section 1.a also prohibited Edible Arrangements from modifying, translating, or creating derivative works based on the Services or Software:

> [Edible Arrangements] will not, directly or indirectly: reverse engineer, decompile, disassemble or otherwise attempt to discover the source code, object code or underlying structure, ideas, know-how or algorithms relevant to the Services or any software documentation or data related to the Services ("Software"); modify, translate, or create derivative works based on the Services or any Software (except to the extent expressly permitted by [Card Isle] or authorized within the Services); use the Services or any Software for timesharing or service bureau purposes or otherwise for the benefit of a third; or remove any proprietary notices or labels. With respect to any Software that is distributed or provided to [Edible Arrangements] for use on [Edible Arrangements] premises or devices, [Card Isle] hereby grants [Edible Arrangements] a non-exclusive, non-transferable, non-sublicensable license to use such Software during the Term only in connection with the Services.

Ex. D § 1.a.

37.     Section 2.a of the Services Agreement prohibited Edible Arrangements from using or disclosing any non-public information regarding features, functionality and performance of Card Isle's Service:

> Each party (the "Receiving Party") understands that the other party (the "Disclosing Party") has disclosed or may disclose business, technical or financial information relating to the Disclosing Party's business (hereinafter referred to as "proprietary information" of the Disclosing Party).  Proprietary Information of [Card Isle] includes non-public information regarding **features, functionality and performance of the Service**. . . . The Receiving Party agrees: (i) to take reasonable precautions to protect such Proprietary Information, and (ii) not to use (except in

performance of the Services or as otherwise permitted herein) or divulge to any
third person any such Proprietary Information.

(emphasis added) Ex. D § 2.a.

38.     Section 4 of the Services Agreement provided that a party may terminate the
Agreement before the conclusion of the one-year Initial Service Term upon 30 days' notice only
"if the other party material breaches any of the terms or conditions of this Agreement."  Upon
termination of the Services Agreement, "all sections which by their nature should survive
termination will survive termination," including without limitation "accrued rights to payment"
and "confidentiality obligations."  Ex. D § 4.b.

39.     The Services Agreement superseded the NDA between Edible Arrangements and
Card Isle and became the "complete and exclusive statement of the mutual understanding of the
parties."  Ex. D § 9.a.

40.     In any action or proceeding to enforce rights under the Services Agreement, "the
prevailing party will be entitled to recover costs and attorneys' fees."  Ex. D § 9.a.  Further, the
Services Agreement "shall be governed by the laws of the State of Georgia without regard to its
conflicts of law provisions."  *Id*.

## IV.    The Franchisee Agreements

41.     Between October 16, 2019 and May 18, 2020,approximately 73 Edible
Arrangements Franchisees, representing 106 unique store locations, signed Franchisee Services
Agreements with Card Isle (example attached as Ex. E).  Pursuant to these Franchisee Services
Agreements, Card Isle agreed to provide the infrastructure and support to the Franchisees to sell
personalized Card Isle products.  In turn, the Franchisees would pay Card Isle a monthly fee and
a fee per each card sold.   The Franchisee Services Agreement also provided that franchisees

would purchase mandatory Greeting Card Printers from Card Isle, under either a monthly-fee or one-time-fee arrangement.

42.     Each Franchisee Services Agreement was for an Initial Service Term of one year. Section 4 of the Franchisee Services Agreements provided that a party may terminate the Agreement before the conclusion of the one-year Initial Service Term upon 30 days' notice only "if the other party material breaches any of the terms or conditions of this Agreement."  Upon termination of the Franchisee Services Agreement, "all sections which by their nature should survive termination will survive termination," including without limitation "accrued rights to payment" and "confidentiality obligations."  Ex. E § 4.b.

## V.     The Vase Insert Product Addendum to the Services Agreement

43.     On January 17, 2020, Edible Arrangements and Card Isle executed an Addendum to the Services Agreement (the "Addendum") (attached as Exhibit F) pursuant to which the parties agreed to add the "Personalized Vase Insert" product to the list of personalized products being offered to the Franchisees under the Services Agreement.  The Personalized Vase Insert allows customers to modify the design of a plastic vase by creating customized paper inserts that are then discretely inserted into plastic vases.

44.     Pursuant to Section 1 of the Addendum, "Waiver of Web Integration Fees & Mandated Roll Out Schedule," Card Isle agreed to waive all Web Integration development fees, the estimated value of which was $45,000, in exchange for a mandated roll out of Card Isle Printing Stations.  *See* Ex. F.  The following milestones were set for the mandated roll out of the Card Isle Service:

- Roll-Out Milestone One: 300 Total Executed Card Isle Agreements by 5:00 pm, February 29, 2020

- Roll-Out Milestone Two: 500 Total Executed Card Isle Agreements by 5:00 pm, March 31, 2020

- Roll-Out Milestone Three: 650 Total Executed Card Isle Agreements by 5:00 pm, April 30, 2020

- Roll-Out Milestone Four: ALL Franchisees Executed Card Isle Agreements by 5:00pm, June 30, 2020

An Executed Agreement was defined as "an Edible franchisee who has signed the Card Isle agreement; has a current billing account established; and whose printer has shipped."

45.     Section 2 of the Addendum required Edible Arrangements to pay Card Isle a $45,000 Fee  if Roll-Out Milestone Three was not met on or by May 22, 2020.  Ex. F.  Section 1 of the Addendum estimates the value of the otherwise waived Web Integration development fees ("Fees") at $45,000.  *Id*.  This $45,000 Fee was to be invoiced on June 1, 2020.  *Id*.

46.     Edible failed to execute 300 Card Isle Agreements by February 29, 2020 at 5:00 pm and missed Roll-Out Milestone One.

47.     Edible failed to execute 500 Card Isle Agreements by March 31, 2020 at 5:00 pm and missed Roll-Out Milestone Two.

48.     Edible failed to execute 650 Card Isle Agreements by April 30, 2020 at 5:00 pm and missed Roll-Out Milestone Three.

49.     Edible also failed to execute 650 Card Isle Agreements by May 22, 2020, thus incurring the $45,000 penalty to be paid if Milestone Three was not met on or by May 22, 2020.

**VI.     Edible Arrangements Attempts to Renegotiate its Contract with Card Isle**

50.     In early March 2020, Ron Reynolds, Chief Operating Officer of Farids & Co., LLC, the umbrella organization that encompasses both Edible Arrangements, LLC and

Netsolace, Inc., contacted Card Isle to discuss renegotiating certain terms of the Services Agreement.

51.     On April 9, 2020, Mr. Reynolds sent an email to Card Isle outlining three demands of Edible's that he stated needed to be secured by April 30, 2020.  First, Edible requested down side protection—in the event that Card Isle was acquired, went bankrupt, or was materially restructured due to financial instability, "EA would have a pre-secured perpetual (evergreen) no-fee license to use any and all elements of the 'Card Isle technology platform' within the Edible Brands technology stack."  Second, Edible demanded that Card Isle grant it the "Right of first refusal" of the Card Isle business and/or any future Asset Purchase Agreement for the assets thereof.  Third, Edible requested a 20% - 25% equity stake in the existing Card Isle business inclusive of all assets currently defined within the company.

52.     In an April 23, 2020 email to Mr. Reynolds, Card Isle rejected Edible's demands.

53.     In response, Mr. Reynolds stated that he had "informed the Edible leadership we are 'pausing' any and all additional roll-outs of the platform/service until [EA's] protections/concerns are addressed."  Mr. Reynolds requested that Card Isle provide a capitalization table, a recent balance sheet, information regarding the company's valuation, information regarding contractual relationships with Canon and other printer vendors, and a statement attesting to what percentage of Card Isle's overall business Edible comprised in March 2020.On April 27, 2020, Card Isle provided responses to these concerns.  First, Card Isle stated it was prepared to negotiate to provide  Edible rights to Card Isle technology in the event that Card Isle faced insolvency.  Second, Card Isle said it was willing to consider a license (with a fee) and/or a "wind down" period in the event of a change of control or acquisition of Card Isle.  Third, Card Isle offered to provide a "notice of interest" to Edible prior to executing any change

in ownership/acquisition by a defined group of competitors.  Finally, Card Isle expressed its

openness "to entertaining any and all ideas to find middle ground and move this deal forward."

54.     On April 30, 2020, following a call between Card Isle and Mr. Reynolds, Card

Isle provided Mr. Reynolds with the following chart providing for access to Card Isle

intellectual property by  Edible Arrangements  in the event of a bankruptcy or other material

change in control of Card Isle:

| CI retains ownership of the items listed below: | In the event of a material change of control of CI (e.g. bankruptcy, acquisition, etc.), EA would have a perpetual, no-fee license to the items listed below: |
|---|---|
| • Greeting card user interface<br>• Greeting card integration library<br>• Greeting card content library<br>• Design invitation (e.g. "phone order tool")<br>• Remote printing engine | • Vase insert user experience<br>• Vase insert content library<br>• Box sleeve user experience<br>• Box sleeve content library<br>• Other products can be appended to this list as they arise |
| | **Printing "easement":** In the event of a material change in control, EA would have the right to print all personalized products listed above. Specifically, CI would provide the technology to generate PDFs of the products listed above, and EA would handle printing (potentially using the same platform used currently to automatically print pick tickets). |

55.     Negotiations continued with Mr. Reynolds through May 6, 2020.

56.     Mr. Reynolds then shut off all communications with Card Isle and has not

responded to a single email or phone call from Card Isle since May 6, 2020.

**VII.   Edible Arrangements Cancels its Contract with Card Isle Without Cause**

57.     On May 19, 2020, Card Isle received a phone call from Edible Brands President

Cheikh Mboup in which Mr. Mboup indicated that EA planned to put a "hold" on the

relationship with Card Isle.  Mr. Mboup elaborated that, pursuant to this hold, both the

development of the vase insert project and the enrollment of new franchises would be halted.

58.     The following day, Card Isle received a moratorium email from Jamie Davis,

Vice President of Supply Chain & Berry Direct at EA confirming that EA "decided to put a

moratorium on its relationship with Card Isle" and indicating that Edible Arrangements was terminating the Services Agreement "consistent with the termination provision of Section 4 of the Agreement."

59.     Section 4 of the Services Agreement provides that a party may terminate the Agreement upon 30 days' notice only "if the other party material breaches any of the terms or conditions of this Agreement."  Ex. D § 4.b.

60.     On June 10, 2020, Card Isle responded to Mr. Davis's May 20 email and explained that "the language [] referenced in Section 4 of the Services Agreement does not include the option to terminate the agreement without cause."  Card Isle stated that it was open to discussing a path to terminate the contract early but first needed Edible to work with Card Isle to resolve certain open issues.  First, Card Isle explained that it did not hold the right to unilaterally cancel franchisee services agreements, and proposed sending Edible a franchisee termination agreement signed by Card Isle for Edible to send to each franchisee.  This termination agreement would become effective upon counter-signature and payment by the franchisee of any outstanding service fees and printer finance fees.  Second, Card Isle demanded that Edible pay the $45,000 Fee for failure to hit mandated roll-out milestones as set forth in the Vase Insert Addendum.  Third, Card Isle requested that Edible maintain the Card Isle website integration for franchisees to ensure a smooth wind down of the Card Isle service.  Card Isle explained that this would ensure that Card Isle did not breach its Service Agreement obligations to franchisees and would ensure that Edible would not be liable for causing such a breach.

61.     On June 11, 2020, Card Isle sent Mr. Davis an invoice for the $45,000 Fee due under Section 2 of the Vase Insert Addendum and a signed Early Termination Letter for Edible to distribute to the franchisees.  Card Isle proposed that Edible hold the signed Early Termination

Letter in escrow and that Card Isle would only authorize Edible to send the signed Early

Termination Letter to franchisees once Card Isle received the $45,000 owed.  Card Isle also

reminded Edible that certain sections of the Services Agreement Terms and Conditions would

survive after termination of the Services Agreement under Section 4.b thereof:

> Without limitation, we understand these to be, and remind you of your duty to comply with, Section 1.a's obligations not to reverse engineer our Software (which includes underlying structure, ideas and know-how), Section 3.a's confidentiality obligations (including regarding nonpublic information regarding features, functionality and performance of our services) and Section 3.b's IP ownership provisions.

62.     Card Isle has not received a response to either the June 10 or June 11 emails.

63.     To date, Edible has not paid Card Isle the $45,000 Fee owed for Edible's failure

to reach the mandated roll out milestones outlined in the Vase Insert Addendum to the Services

Agreement.

**VIII.    Defendants Use Card Isle's Confidential and Proprietary Information to Create their Substantially Similar "Printible" Product**

64.     In early October 2020, Defendants launched "Printible," touted by Edible Brands

as "the company's new technology designed for growing a new product category of seasonal and

everyday greeting cards that can be digitally customized to create truly personalized gifts."  *See*

Ex. G at 1.  In a press release, Defendants asserted that the launch of Printible "follow[ed] a

successful test of customizable greeting card sales across select Edible locations."  *Id*. at 2.

Further, Edible claimed that "[t]he cards and customization capabilities of Printible are unique to

Edible, made possible with proprietary technology created by the brand's technology solutions

arm, Netsolace."  *Id*.

65.     Upon information and belief, the Printible source code originated from Card Isle's

Edible Arrangements-specific JavaScript library and Edible Arrangements and Netsolace copied,

reverse engineered, decompiled, disassembled, and/or otherwise misappropriated Card Isle's copyrighted source code and Software to create Printible, their replica of Card Isle's service.

66.     JavaScript can dynamically generate HTML and can also handle the interactive functions of a website.  A comparison of the Card Isle JavaScript and the Printible JavaScript demonstrates substantial similarity between the two.  There is a clear overlap of the variables in the dynamically generated HTML, and nearly every interactive function from Edible Arrangement's code has a direct overlap with a preexisting Card Isle function, as the examples below reflect:

**Dynamically generated HTML**

| Card Isle HTML Variables | Printible HTML Variables |
|---|---|
| #card-isle-container | #printibleContainer |
| #CI-cards-img | #printibleCardImage |
| #CI-card-validation | #printibleCardValidation |
| #CI-complimentary-message | #printibleCardHeadline |
| #CI-no-container | #notIncludeCard |
| #CI-no-message | #printibleNoCard |
| #CI-card-preview-text | #displaySelectedCard |
| #card-isle-iframe | #printibleFrameContainer |
| .card-isle-button | .printibleButton |

**Interactive Functions**

| Card Isle Functions | Printible Functions |
|---|---|
| CI_setup_product_page() | preparePrntibleCardPage() |
| --- | validatePrintibleChange() |
| --- | shownEffects() |
| CI_toggle_complimentary() | showHideSuggestedMsg() |
| initiate_card_isle_widget() | prepearePrintibleOptions() |
| CI_remove_card() | deleteCard() |
| CI_link_checkboxes() | associateNoMessagecheckboxes() |
| CI_checkbox_update() | printibleAddonSelected() |
| CI_show_card() | displayPrintibleCard() |
| CI_attach_funcs_to_elements() | enableClickables() |
| CI_hide_and_enable() | printibleAddonMarkHidden() |
| CI_generate_HTML() | addPrintibleContainer() |

67.     There are also instances in which the Printible code looks nearly identical to Card Isle's original JavaScript (and has the same function), as demonstrated in the below example:

| Card Isle's Original JavaScript File (edible_v1.js) | Printible's JavaScript File (printible_v1.js) |
|---|---|
| … <br> jQuery("#CI-card-validation").text(' Please choose a greeting card or complimentary gift message so that the recipient knows who is sending this gift.'); <br><br> … <br> jQuery("#CI-card-preview-text").html("<span style='font-weight:normal'><img style='max-width:100px; max-height:100px; float:left; margin: 10px 10px 20px " + margin_left + "px; border: solid 1px lightgray' src='" + card.card_image + "'/></span>"); <br><br> … <br> jQuery(".dvcardMessage").contents().filter(function () { return this.nodeType == 3; })[0].replaceWith(''); <br><br> … <br> var replacement_html = '<div class="frame-container" id="card-isle-frame-container"> \ <iframe id="card-isle-iframe" class="card-iframe" onload="setSession()" name="card-frame" src="'+replacement_html_src+'" allowfullscreen="" frameborder="0" referrerpolicy="unsafe-url"> \ <p>Your browser does not support iframes.</p> \ </iframe> \ </div>'; <br><br> … <br> document.getElementsByTagName("BODY")[0].insertAdjacentHTML('afterend', replacement_html); <br><br> … <br> function CI_checkbox_update(status) { <br><br> … <br> var card_addon = { "ProductID": parseInt(CI_productid), "Price": parseInt(CI_product_price), "Quantity": 1, "ItemType": 4, "OptionText": "", "Sleeve": false, "ImagePrefixSleeve": "", "DefaultSleeve": false, "ProductName": "", "ProductImagePath": "", "ParentProductID": 0, "Numbers": null, "Years": null }; <br> if (CI_is_mobile) { <br> if (status) { | var printibleProps = { <br> validationMessage: 'Please choose a greeting card or complimentary gift message so that the recipient knows who is sending this gift.', <br><br> selectedCardTemplate: "<span style='font-weight: normal'><img style='max-width: 100px; max-height: 100px; float: left; margin: 10px 10px 20px 0px; border: solid 1px lightgray' src='##IMGSRC##'/></span>", <br><br> … <br> $(".dvcardMessage").contents().filter(function () { return this.nodeType === 3; }).replaceWith(''); <br><br> … <br> var framehtml = '<div class="printibleframe-container" hidden" id="printibleFrameContainer"><iframe id="printibleIframe" src="' + printibleProps.popURL + '" referrerpolicy="unsafe-url" frameborder="0"> <p>Browser Support Error: Browser Does Not Support iframe.</p></iframe></div><div class="overlay-frame hidden"></div>'; <br><br> … <br> document.getElementsByTagName("body")[0].insertAdjacentHTML('beforeEnd', framehtml); <br><br> … <br> function printibleAddonSelected(status) { <br><br> … <br> var printibleJson = { "ProductID": parseInt(PrintibleAddonProductId), "Price": parseInt(PrintibleAddonProductPrice), "Quantity": 1, "ItemType": 4, "OptionText": "", "Sleeve": false, "ImagePrefixSleeve": "", "DefaultSleeve": false, "ProductName": "", "ProductImagePath": "", "ParentProductID": 0, "Numbers": null, "Years": null }; <br> if (IsMobileSite === true) { <br> if (status === true) { |

68.     A comparison of the HTML generated by Card Isle's source code and the HTML generated by Edible's new Printible source code demonstrates that the two look and feel substantially similar.

**Card Isle's Generated HTML**



**Printible's Generated HTML**



69.     In fact, a comparison of the generated HTML via copyleaks.com—an online, artificial-intelligence based plagiarism checker—reveals an ***87.8 percent overlap*** between Card Isle's original HTML and the new Printible HTML.

70.     Upon information and belief, Printible uses a third-party integration structure that is substantively identical to Card Isle's confidential and proprietary eCommerce integration structure, and it is evident that Edible and Netsolace copied, reverse engineered, decompiled, disassembled, and/or otherwise misappropriated Card Isle's code.  Although portions of Card Isle's code are publicly accessible, multiple sections of this code have been overtly copied and pasted into the Printible code. Without access to the Card Isle eCommerce Integration Blueprint shared with Edible and Netsolace pursuant to the NDAs and the Services Agreement, it would be very difficult, time consuming, and costly for an outside software developer to create such a seamless integration platform, which Card Isle created after years of development and investment.

71.     Because Defendants have employed a substantively identical version of Card Isle's eCommerce integration platform, Defendants are now easily able to integrate their Printible product into other retailers' websites, giving Edible and Netsolace a competitive edge in the marketplace in direct competition with Card Isle—a feat made possible only by copying, reverse engineering, decompiling, disassembling, and/or otherwise misappropriating Card Isle's confidential information and intellectual property.

72.     Upon information and belief, Defendants have also copied portions of Card Isle's proprietary Printing Service.

### Count One: Breach of Contract
### (Edible Arrangements)

73.     Card Isle incorporates by reference all preceding paragraphs of this Complaint.

74.     Card Isle and Edible Arrangements entered into a valid and enforceable Services Agreement and Addendum.

75.     Section 1.a of the Services Agreement prohibited Edible Arrangements from directly **or indirectly** reverse engineering, decompiling, disassembling, or otherwise attempting to discover the source code, object code or underlying structure, ideas, know-how or algorithms relevant to the Services or the Software.  *See* Ex. D § 1.a.

76.     Section 2.a of the Services Agreement prohibited Edible Arrangements from using or disclosing any non-public information regarding features, functionality and performance of Card Isle's Service.  *See* Ex. D § 2.a.

77.     Section 4 of the Services Agreement provided that a party may terminate the Agreement before the conclusion of the one-year Initial Service Term upon 30 days' notice *only* if the other party material breaches any of the terms or conditions of the Agreement.  *See* Ex. D § 4.b.

78.     Section 2 of the Addendum, titled "Penalty for failure to hit mandated roll-out milestones," required Edible Arrangements to pay Card Isle a $45,000 penalty if Roll-Out Milestone Three of the Addendum was not met on or by May 22, 2020.  Ex. F.

79.     Edible Arrangements breached the Services Agreement by reverse engineering, decompiling, disassembling, or otherwise attempting to discover the source code, object code or underlying structure, ideas, know-how or algorithms relevant to Card Isle's Services and Software in violation of Section 1.a, whether directly or indirectly via the actions of Netsolace.

80.     Edible Arrangements breached the Services Agreement by using non-public information regarding features, functionality and performance of Card Isle's Service in violation of Section 2.a, whether directly or indirectly via the actions of Netsolace.

81.     Edible Arrangements breached the Services Agreement by terminating the Services Agreement without cause more than five months early in violation of Section 4.

82.     Edible Arrangements failed to execute 650 Card Isle Agreements by April 30, 2020 at 5:00 pm and missed Roll-Out Milestone Three.  Edible also failed to execute 650 Card Isle Agreements by May 22, 2020, thus incurring the $45,000 Fee to be paid if Milestone Three was not met on or by May 22, 2020.  Edible Arrangements breached the Addendum by failing to pay Card Isle the $45,000 Fee owed pursuant to Section 2 of the Addendum.

83.     As a direct and proximate result of Edible Arrangement's breaches of contract, Card Isle has suffered and will continue to suffer damages in an amount to be determined at trial, including consequential damages, attorneys' fees, and pre- and post-judgment interest to the extent permitted by law.

### Count Two: Misappropriation of Trade Secrets, Ga. Code Ann. § 10-1-760 *et seq.*[1]
### (All Defendants)

84.     Card Isle incorporates by reference paragraphs 1 through 72 of this Complaint.

85.     Defendants sought and misappropriated Card Isle's confidential and proprietary information.  The Card Isle Version 3 Source Code, Card Isle eCommerce integration structure, and Card Isle functionality are protectible as trade secrets, i.e., information that is not commonly known by or available to the public, derives economic value from not being generally known to others or readily ascertainable by others using proper means, and is the subject of reasonable efforts to maintain its secrecy.

86.     Card Isle used, and continues to use, reasonable security measures to maintain the secrecy of its trade secrets.  For example, Card Isle functionality is only available to administrative level users.  It is Card Isle's standard and common practice to use confidentiality agreements before providing clients access to information regarding the Card Isle eCommerce integration structure and the Card Isle eCommerce Integration Blueprint.  In addition, Card Isle uses prominent copyright notices to warn users that its source code is confidential, proprietary, and copyrighted.

87.     Defendants misappropriated Card Isle's trade secret information by knowingly acquiring Card Isle's trade secret information by improper means, including breach of a confidential relationship or other duty to maintain secrecy or limit use as set forth in the NDAs and Services Agreement.  Specifically, Defendants have obtained from Card Isle specific information about the Card Isle Version 3 Source Code, Card Isle eCommerce integration, and Card Isle functionality.  This information possesses independent economic value from not being

---

[1] If this Court finds that Virginia law applies to this claim, Card Isle requests leave to amend this Complaint and instead bring this Count pursuant to the substantively identical Virginia Uniform Trade Secrets Act, Va. Code Ann. § 59.1-336 *et seq.*

generally known in the industry, and is subject to reasonable efforts to maintain its confidentiality.

88.     Card Isle has suffered and will suffer actual losses as a result of Defendants' misappropriation of trade secrets in that Defendants have offered and are offering an improperly derived competing product, thus causing Card Isle to lose sales.

89.     In addition, Defendants have been, and will continue to be, unjustly enriched in that they saved considerable time and expenses in developing their competing product because Defendants improperly used the misappropriated information, and because Defendants have been able to offer a competing product earlier than they would have otherwise had Defendants' competing product been developed without improperly acquired information.

90.     Defendants' misappropriation was willful and malicious thus entitling Card Isle to punitive damages pursuant to Ga. Code Ann., § 10-1-763(b) and attorneys' fees pursuant to Ga. Code Ann., § 10-1-764.

### Count Three: Misappropriation of Trade Secrets, Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*
### (All Defendants)

91.     Card Isle incorporates by reference paragraphs 1 through 72 of this Complaint.

92.     Defendants sought and misappropriated Card Isle's confidential and proprietary information.  The Card Isle Version 3 Source Code, Card Isle eCommerce integration structure, and Card Isle functionality are protectible as trade secrets, i.e., information that is not commonly known by or available to the public, derives economic value from not being generally known to others or readily ascertainable by others using proper means, and is the subject of reasonable efforts to maintain its secrecy.

93.     Card Isle used, and continues to use, reasonable security measures to maintain the secrecy of its trade secrets.  For example, Card Isle functionality is only available to administrative level users.  It is Card Isle's standard and common practice to use confidentiality agreements before providing clients access to information regarding the Card Isle eCommerce integration structure and the Card Isle eCommerce Integration Blueprint.  In addition, Card Isle uses prominent copyright notices to warn users that its source code is confidential, proprietary, and copyrighted.

94.     Card Isle's trade secrets relate to products and/or services used in, or intended for use in, interstate or foreign commerce.

95.     Defendants misappropriated Card Isle's trade secret information by knowingly acquiring Card Isle's trade secret information by improper means, including breach of a confidential relationship or other duty to maintain secrecy or limit use as set forth in the NDAs and Services Agreement.  Specifically, Defendants have obtained from Card Isle specific information about the Card Isle Version 3 Source Code, Card Isle eCommerce integration, and Card Isle functionality.  This information possesses independent economic value from not being generally known in the industry, and is subject to reasonable efforts to maintain its confidentiality.

96.     Card Isle has suffered and will suffer actual losses as a result of Defendants' misappropriation of trade secrets in that Defendants have offered and are offering an improperly derived competing product, thus causing Card Isle to lose sales.

97.     In addition, Defendants have been, and will continue to be, unjustly enriched in that they saved considerable time and expenses in developing their competing product because Defendants improperly used the misappropriated information, and because Defendants have been

able to offer a competing product earlier than they would have otherwise had Defendants'

competing product been developed without improperly acquired information.

98.     Defendants' misappropriation was willful and malicious thus entitling Card Isle to

punitive damages pursuant to 18 U.S.C. § 1836(b)(3)(C) and attorneys' fees pursuant to 18

U.S.C. § 1836(b)(3)(D).

<div align="center">

**Count Four: Copyright Infringement, 17 U.S.C. § 101 *et seq.***
**(All Defendants)**

</div>

99.     Card Isle incorporates by reference paragraphs 1 through 72 of this Complaint.

100.    Card Isle owns and has a valid copyright in the "Card Isle Code Base Version 3"

software.  A true and correct copy of the certificate of copyright registration, Copyright

Registration No. TXu002222301, is attached as Exhibit C.

101.    Card Isle's Code Base Version 3 software contains computer code that embodies

Card Isle's eCommerce integration process and constitutes copyrightable subject matter within

the meaning of 17 U.S.C. § 102.

102.    Defendants had access to Card Isle's copyrighted materials through the terms of

the NDAs and the Services Agreement.

103.    Without authorization, and in breach of the terms of the NDAs and Services

Agreement, Defendants have copied, publicly displayed, and distributed products derived from

Card Isle's copyrighted materials, and will continue to do so.

104.    Defendants' products, including the Printible product, are substantially similar to

the protected elements of Card Isle's copyrighted materials.

105.    Defendants' infringement has been willful, intentional, and purposeful, in

disregard of and indifferent to Card Isle's rights.

106.    Defendants' conduct constitutes a violation of 17 U.S.C. § 101 *et seq.*, and especially § 501 *et seq.*

107.    As a direct and proximate result of Defendants' copyright infringement, Card Isle has suffered actual and irreparable injury for which no adequate remedy exists at law.  Unless restrained and enjoined pursuant to 17 U.S.C. § 502, Defendants will continue to engage in the acts complained of herein and, therefore, will continue to cause irreparable harm to Card Isle.

108.    As a result of Defendants' copyright infringement, Card Isle is entitled to the maximum statutory damages pursuant to 17 U.S.C. § 504(c).

109.    Card Isle is entitled to its costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505.

## **PRAYER FOR RELIEF**

WHEREFORE, Card Isle respectfully requests that this Court:

A.    On Count One:

(a)    Enter judgment that Edible Arrangements materially breached the Services Agreement and the Addendum; and

(b)    Order Edible Arrangements to pay Card Isle compensatory and punitive damages in an amount to be determined at trial, plus the $45,000 Fee owed under the Addendum to the Services Agreement, attorneys' fees, and pre- and post-judgment interest to the extent permitted by law.

B.    On Count Two:

(a)    Enter judgment that Defendants misappropriated Card Isle's trade secrets and such misappropriation has been willful;

(b)   Preliminarily and permanently enjoin Defendants and their employees, agents, officers, directors, shareholders, member, subsidiaries, related companies, affiliates, distributors, dealers, and all persons in active concert or participation with Defendant, from accessing, using, distributing, copying, disclosing, or otherwise exploiting Card Isle's trade secrets, as provided by the Georgia Trade Secrets Act, Ga. Code Ann. § 10-1-762;

(c)   Order Defendants to (i) return to Card Isle all trade secret information, in whatever form, and all copies and derivatives of the same; (ii) if trade secret information was contained in electronic format, deliver that information to Card Isle or delete, destroy, or otherwise render that information inaccessible; and (iii) provide evidence to conclusively establish compliance with the terms set forth in (i) and (ii);

(d)   Order Defendants to pay Card Isle damages for the actual loss caused by Defendants' trade secret misappropriation and the unjust enrichment caused by misappropriation and, at a minimum, damages in the form of a reasonable royalty for Defendants' unauthorized use of Card Isle's trade secrets, as provided by the Georgia Trade Secrets Act, Ga. Code Ann. § 10-1-763(a);

(e)   Order Defendants to pay Card Isle exemplary damages for Defendants' willful and malicious misappropriation of Card Isle's trade secrets, as provided by the Georgia Trade Secrets Act, Ga. Code Ann. § 10-1-763(b); and

29

(f)     Order Defendants to pay Card Isle's attorneys' fees, as provided by the Georgia Trade Secrets Act, Ga. Code Ann. § 10-1-764.

C.     On Count Three:

(a)     Enter judgment that Defendants misappropriated Card Isle's trade secrets and such misappropriation has been willful;

(b)     Preliminarily and permanently enjoin Defendants and their employees, agents, officers, directors, shareholders, member, subsidiaries, related companies, affiliates, distributors, dealers, and all persons in active concert or participation with Defendant, from accessing, using, distributing, copying, disclosing, or otherwise exploiting Card Isle's trade secrets, as provided by 18 U.S.C. § 1836(b)(3)(A);

(c)     Order Defendants to (i) return to Card Isle all trade secret information, in whatever form, and all copies and derivatives of the same; (ii) if trade secret information was contained in electronic format, deliver that information to Card Isle or delete, destroy, or otherwise render that information inaccessible; and (iii) provide evidence to conclusively establish compliance with the terms set forth in (i) and (ii);

(d)     Order Defendants to pay Card Isle damages for the actual loss caused by Defendants' trade secret misappropriation and the unjust enrichment caused by misappropriation and, at a minimum, damages in the form of a reasonable royalty for Defendants' unauthorized use of Card Isle's trade secrets, as provided by 18 U.S.C. § 1836(b)(3)(B);

(e)    Order Defendants to pay Card Isle exemplary damages for Defendants' willful and malicious misappropriation of Card Isle's trade secrets, as provided by 18 U.S.C. § 1836(b)(3)(C); and

(f)    Order Defendants to pay Card Isle's attorneys' fees, as provided by 18 U.S.C. § 1836(b)(3)(D).

D.    On Count Four:

(a)    Enter judgment that Card Isle owns valid and enforceable copyrights in Card Isle Code Base Version 3;

(b)    Enter judgment that Defendants have infringed Card Isle's copyright and such infringement has been willful;

(c)    Preliminarily and permanently enjoin Defendants and their employees, agents, officers, directors, shareholders, member, subsidiaries, related companies, affiliates, distributors, dealers, and all persons in active concert or participation with Defendants from infringing Card Isle's copyright, as provided by the Copyright Act, 17 U.S.C. § 502;

(d)    Order Defendants to pay Card Isle actual damages plus Defendants' profits from its copyright infringement, together with any applicable interest, as provided by the Copyright Act, 17 U.S.C. § 504(b);

(e)    Order Defendants to pay Card Isle enhanced damages for willful and intentional copyright infringement, as provided by the Copyright Act, 17 U.S.C. § 504(c); and

(f)    Order Defendants to pay Card Isle's costs, including reasonable attorneys' fees, as provided by the Copyright Act, 17 U.S.C. § 505.

E.    Grant pre-judgment and post-judgment interest; and

F.    Grant such other relief as the Court deems just and proper.

## JURY DEMAND

Card Isle hereby demands a trial by jury on all issues so triable.

Dated: November 24, 2020                     Respectfully submitted,

                                             */s/ Robyn Cort Quattrone*
                                             Robyn Cort Quattrone (VA Bar No. 43117)
                                             Andrew L Sandler (*pro hac vice* forthcoming)
                                             Stephen LeBlanc (*pro hac vice* forthcoming)
                                             Rebecca Guiterman (*pro hac vice* forthcoming)
                                             **MITCHELL SANDLER LLC**
                                             1120 20th Street NW, Suite 725
                                             Washington, DC 20036
                                             Telephone:    (202) 886-5260
                                             rquattrone@mitchellsandler.com
                                             asandler@mitchellsandler.com
                                             sleblanc@mitchellsandler.com
                                             rguiterman@mitchellsandler.com


                                             *Attorneys for Plaintiff*